UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS LEAVEY,

               Plaintiff,

    -against-

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS – THEATRICAL TEAMSTERS
LOCAL UNION No. 817, and THOMAS J.
O'DONNELL,

               Defendant.

No. 13-cv-0705 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Thomas Leavey, a member of the International Brotherhood of Teamsters –

Theatrical Teamsters Local Union No. 817 ("Local 817" or the "Union"), initiated the instant

action against Local 817 and Thomas J. O'Donnell ("O'Donnell," together with Local 817 or the

Union, "Defendants") for refusing to provide access to documents and information in violation

of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 414, 431(c),

and 440; breach of the duty of fair representation in discriminating against Plaintiff in job

referrals and in refusing to provide Plaintiff with job referral information, pursuant to Section 8

of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, and Section 301(a) of the

Labor-Management Relations Act, 1947 ("LMRA"), 29 U.S.C. § 158(a); and for discrimination

in job referrals in retaliation for exercising his free speech rights, pursuant to the LMRDA, 29

U.S.C. § 411 *et seq.*

Before the Court is Defendants' motion for summary judgment. For the following

reasons, Defendants' motion is GRANTED in part and DENIED in part.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/5/2015

## BACKGROUND

The following facts, unless otherwise noted, are based on the undisputed facts in this matter or support Plaintiff's version of events.

Plaintiff is and has been a member of Local 817 since 1974.  (Pl.'s 56.1 ¶ 1.)  O'Donnell has been the president of Local 817 since approximately January 2012 and was previously the Secretary Treasurer of Local 817 from 1990 to 2012.  (*Id*. ¶ 2.)  Local 817 is a labor organization as defined in Section 2(5) of the NLRA, 29 U.S.C. § 152(5).  (*Id*. ¶ 3.)  The Union is the exclusive collective bargaining agent for various captains, drivers, helpers, special equipment drivers, and warehousemen working in the motion picture, television, commercial, video, live event, theater, and concert hall industries.  (*Id*. ¶ 4.)  Plaintiff has worked as a captain, driver, and helper, among other things, since he began shaping with the Union in 1966.  (*Id*. ¶ 59.)  He first began working as a captain in the 1980s.  (*Id*. ¶ 60.)

## I.      Union's Process for Referral and Captain Selection

Local 817 refers drivers, helpers, loaders, and other labor to employment through its hiring hall.  (Pl.'s 56.1 ¶ 6.)  The Union also refers captains to employment on television and film jobs; however, those referrals are not made through the Union's hiring hall.  (*Id*. ¶ 7.)  Captains are responsible for managing transportation on a production; working with producers to ensure a production's transportation, staffing, and driving needs are handled efficiently and cost-effectively; and supervising the set.  (*Id*. ¶ 8.)  A captain also enforces the terms of a collective bargaining agreement ("CBA") on a particular job to which the captain is assigned.  (*Id*. ¶ 9.)

The Majors' Agreement is a CBA covering 23 major studios.  (*Id*. ¶¶ 15–16, 113.)  The Majors' Agreement does not cover every production, and, even to the extent it does cover a production, there are sometimes modifications.  (*Id*. ¶ 15.)

While there may be certain accommodations to the Majors' Agreement, O'Donnell does not put them in writing.  (*Id*. ¶¶ 17–18.)

Article 3-A of the Majors' Agreement governs the selection of captains.  (*Id*. ¶ 33.) When requested by a company, the Union submits the names of five available captains.  (*Id*.) From there, the Company narrows down the list to three captains and thereafter the Union makes the final designation.  (*Id*. ¶ 33.)  This process is referred to as the "list of five."  (*Id*. ¶ 34.) Captains not selected from a list of five are typically considered for the next production to the extent they are still available.  (*Id*. ¶ 36.)  In certain instances, a producer will request a captain by name, or O'Donnell recommends captains that are available and he feels are suited to the job. (*Id*. ¶ 33.)  O'Donnell testified that he takes into account the demands of a given job, an employer's preferences, and the relative experience of captains; however, there is no written criteria governing how O'Donnell should select the initial list of five names.  (*Id*. ¶ 37.) Additionally, O'Donnell considers his own interactions with the captain, feedback from prior employers, feedback from executive board members, and feedback from other captains in the selection process.  (*Id*. ¶ 39.)  O'Donnell does not track how he applies these factors.  (*Id*. ¶ 40.) Often, the captain selection process is conducted over the phone, and O'Donnell does not keep notes or records of those calls.  (*Id*. ¶ 35.)  O'Donnell typically does not employ the list of five process for low budget films, and, in the event there are no available captains to create a list of five, O'Donnell may need to create a captain.  (*Id*. ¶ 34.)   On certain occasions, O'Donnell discusses producer feedback with captains, including negative feedback.  (*Id*. ¶ 43.)

## II.     Plaintiff's Selection as Captain

Even in instances where management or producers have indicated they did not wish to work with Plaintiff, O'Donnell still has placed Plaintiff's name on the list of five.  (Pl.'s 56.1 ¶

45.)  O'Donnell explained he does this when the industry is busy or when he attempts to talk a producer into giving Plaintiff a second chance.  (*Id.* ¶ 45.)

In Plaintiff's opinion, he believed that the Union blacklisted him by slandering his reputation.  (*Id*. ¶ 41.)  He also testified that producers crossed his name off the list for potential captain positions so as not to "alienate" O'Donnell.  (*Id*. ¶ 42.)  Plaintiff was also told by O'Donnell that he was a "Class B captain."  (*Id*. ¶ 48.)

Plaintiff experienced a decline in captain work beginning in October 2011.  (*Id*. ¶ 48.) From 2006 to 2010, Plaintiff was ranked in the middle of the list of captains with regard to annual earnings; however, Plaintiff has ranked second-to-last from 2011 to the present.  (*Id*.) From October 2011 to the present, Plaintiff has earned approximately $150,000 to $200,000 less than similarly situated captains.  (*Id*.)  Additionally, while Plaintiff worked approximately 149 days as a captain in 2011 (*id*. ¶ 63), he only worked 70 days as a captain in 2012 (*id*. ¶ 66) and 100 days as a captain in 2013.  (*Id*. ¶ 68.)  Plaintiff earned $186,500 in 2011 (*id*. ¶ 65), $154,000 in 2012 (*id*. ¶ 67), and $180,000 in 2013.  (*Id*. ¶ 69.)

Plaintiff has received positive feedback from producers on various jobs, including his performance on the sets of "Premium Rush" and "Public Morals."  (*Id*. ¶ 49.)  In certain instances, Plaintiff was requested by producers to be a captain.  (*Id*. ¶ 49.)

O'Donnell has had in-person and phone conversations with Plaintiff to discuss Plaintiff's complaints regarding the referral system and has never refused to meet with Plaintiff.  Those meetings typically have occurred once a year over the past 10 years.  (*Id*. ¶ 56.)  During those meetings, Plaintiff told O'Donnell that senior captains should be offered work; however, O'Donnell told Plaintiff that producers have the right to refuse whomever they want.  (*Id*. ¶ 57.)

4

### III.     Plaintiff's Alleged Free Speech

Plaintiff points to several instances in which he exercised his "free speech" rights.  First, Plaintiff sets forth evidence regarding a series of incidents in which Plaintiff's support for certain individuals allegedly detracted from his ability to obtain captain work.  It is undisputed that Mickey Fennell wanted to become a captain.  (Pl.'s 56.1 ¶ 89.)  Plaintiff was open regarding his support for Fennell to become a captain, and he believed he shared this support with Union officers.  (*Id*. ¶ 90.)  Plaintiff also supported Henry Boyle, whom Plaintiff testified lost work because he was outspoken regarding Union issues.  (*Id*. ¶¶ 91, 93.)  The Union did not object to Plaintiff's requests that Boyle work on jobs at which Plaintiff was the captain.  (*Id*. ¶ 92.)  The Union was aware of Plaintiff's support for Boyle as Plaintiff continued to request Boyle on his jobs.  (*Id*. ¶ 94.)  Plaintiff also supported John Brady in his attempts to become a member of the Union.  (*Id*. ¶ 96.)  Plaintiff offered to testify on Brady's behalf in Brady's lawsuit against the Union, but did not explicitly tell the Union he supported Brady's lawsuit.  (*Id*.)  However, Plaintiff believes that Union officers learned of Plaintiff's support for Brady through the "grapevine."  (*Id*.)

Second, Plaintiff vocalized a series of grievances to union members or union officials.  In 1995, Plaintiff lodged a complaint regarding the length of time it took for Maurice Fitzgerald to be appointed to a certain captain job, specifically that Fitzgerald was referred ahead of Plaintiff. (*Id*. ¶ 102.)  In 2008, Plaintiff and other individuals working on the set of "30 Rock" sent a petition to the Union objecting to a trade of the Election Day holiday with the day following Thanksgiving Day.  (*Id*. ¶ 99.)  During a Union meeting, Plaintiff spoke out about this trade. (*Id*.)  In November 2010, Plaintiff complained to O'Donnell regarding the working conditions on

the set of "Premium Rush."  (*Id*. ¶ 97.)  In particular, Plaintiff felt the producers were sending him a message by providing him a small, noisy, crowded, and unsecure working space.  (*Id*.)

Third, Plaintiff sent O'Donnell (and in one instance, O'Donnell and the Union's executive board) several correspondence regarding complaints with respect to union activity.  In June 2002, Plaintiff sent a letter to O'Donnell and the Union executive board regarding the appointment of Whalen over Plaintiff for a particular captain job.  (*Id*. ¶ 103.)  Plaintiff claimed he should have received the job because he was senior to Whalen.  (*Id*.)  In July 2005, Plaintiff sent a letter to O'Donnell stating that Plaintiff was being blacklisted by the Union in that his name was excluded from the captains list.  (*Id*. ¶ 104.)  In June 2012, Plaintiff sent O'Donnell a letter complaining that he was denied work and stating that he was being bypassed for jobs.  (*Id*. ¶ 106.)  The letter purported to file a grievance "against all Hollywood and Independent Producers of Films, Motion Picture and Television shows and Productions" on behalf of "all Teamster Captains."  (Anspach Decl., Ex. B at Ex. 16.)  Later that same month, the Union responded to Plaintiff's letter requesting more specificity with regard to Plaintiff's grievance.  (Pl.'s 56.1 ¶ 109.)  Plaintiff subsequently sent a letter to O'Donnell in July 2012 outlining certain categories of documents he sought to pursue his grievance.  (Anspach Decl., Ex. B at Ex. 18.)  The Union did not respond to that letter.  (Pl.'s 56.1 ¶ 121.)

Additionally, Plaintiff made inquiries about and complaints regarding the retirement fund and scholarship fund.  (*Id*. ¶ 126.)  Plaintiff also lodged general, unspecified complaints regarding the assignment of captain work.  (*Id*. ¶ 122.)  Plaintiff is a member of Teamsters for a Democratic Union ("TDU").  (*Id*. ¶ 85.)  Plaintiff believes he told O'Donnell that he was a member of TDU but could not recall the specifics of when he told O'Donnell.  (*Id*. ¶ 86.)

**IV.     Plaintiff's Requests for Documents and Information**

Any individual working on a job is entitled to have a copy of the operative CBA upon request.  (Pl.'s 56.1 ¶ 111.)  O'Donnell typically does not make copies of the contract available until they are fully executed.  (*Id*.)  Plaintiff has requested the operative CBA on multiple occasions, and Plaintiff did not receive a copy of the CBA on every occasion.  (*Id*. ¶ 33.)  According to O'Donnell, in certain instances Plaintiff did not receive a copy of the CBA because it was universal and Plaintiff already had a copy.  (*Id*.)

The Union renegotiated the Majors' Agreement in 2013.  (*Id*. ¶ 113.)  During an October 2013 membership meeting, the proposed changes were read out to Union members, and Plaintiff requested a copy of the renegotiated agreement.  (*Id*.)  Plaintiff abstained from voting on the proposed changes because he was not afforded an opportunity to see the proposed changes in writing.  (*Id*.)  Plaintiff requested a copy of the CBA for "London Calling" (aka Spiderman) in March 2013.  (*Id*. ¶ 114.)  O'Donnell told Plaintiff that since Spiderman was covered by the Majors' Agreement and since Plaintiff possessed the Major's Agreement, he already had the relevant contract for Spiderman.  (*Id*.)  There is no evidence that Plaintiff received a copy of the CBA for "A Further Gesture."  (*Id*. ¶ 115.)

Union members also are entitled to a copy of the Union's constitution and bylaws upon request.  (*Id*. ¶ 116.)  In February 2012, the Union membership approved amendments to the constitution and bylaws.  (*Id*.)  During the February 2012 meeting, members were told that they would receive a copy of the new constitution and bylaws once the changes were approved by the International Brotherhood of Teamsters ("IBT").  (*Id*.)  Plaintiff received a copy of the amended constitution and bylaws in or around December 2013 (following approval by IBT) (*id*. ¶ 118), and he received a copy of the previous constitution and bylaws on July 17, 2013.  (*Id*. ¶ 117.)

7

In connection with his June 2012 grievance, Plaintiff requested copies of all documents pertaining to Plaintiff's work, all producer requests for captains, all captain jobs since January 1, 2012, copies of referrals to production companies, copies of the list of captains, including their seniority and number of days worked in 2012, copies of the records of captain earnings, and copies of the "shape hall rules" for captains.  (*Id.* ¶ 119.)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted).  In reviewing the record, "the judge's function is not himself to weigh

the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Moreover, "[a non-moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) aff'd, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

### I. LMRDA Sections 104 and 201 Claims

Section 104 of the LMRDA provides that "[i]t shall be the duty of the secretary or corresponding principal officer of each labor organization, in the case of a local labor organization, to forward a copy of each collective bargaining agreement made by such labor

9

organization with any employer to any employee who requests such a copy and whose rights as such employee are directly affected by such agreement . . . ."  29 U.S.C. § 414.  Section 201 further requires that a union make available to its members a copy of its constitution and bylaws. 29 U.S.C. § 431(a), (c).

Defendants contend that Plaintiff's LMRDA claims regarding requests for documents and information are meritless because, among other things: (1) Local 817's policy is to provide copies of CBAs to the union members working under those agreements; (2) Plaintiff was provided access to three CBAs, specifically, the Majors' Agreement, "A Further Gesture" CBA, and the "Spiderman" CBA; (3) the newly renegotiated Majors' Agreement was not executed at the time Plaintiff requested that agreement; (4) Plaintiff was provided access to Local 817's new constitution and bylaws once those documents were approved by the International Brotherhood of Teamsters; and (5) the June 2012 request for information was not made in good faith.  (Defs.' Mem. at 21–24.)

Plaintiff counters that, among other things: (1) Defendants refused to provide Plaintiff with CBAs for certain jobs he was working on; (2) Defendants "do not maintain any records of requests for contracts or when contracts are provided"; (3) despite his receipt of the new constitution and bylaws upon their approval after the advent of this litigation, Plaintiff did not receive a copy of the existing constitution and bylaws; (4) Plaintiff's June 2012 request for information was intended to help Plaintiff "better understand the captain referral process and how he was treated"; and (5) even if the June 2012 request was "illegitimate," Defendants were nevertheless required to turn over the information.  (Pl.'s Opp. at 8–11.)

O'Donnell acknowledged that "it's the right of any member" to receive a copy of the CBA governing a particular job; however, Local 817 does not track members' requests for

copies of contracts.  (Hunter Aff., Ex. B at 112:5–7.)  He further testified that Plaintiff requested

copies of CBAs "[o]n multiple occasions" and received copies of the contracts "several times."

(*Id*. at 112:13–16.)  O'Donnell recalled two occasions on which Plaintiff did not receive copies

of the CBA (*id*. at 113:17–21): (1) O'Donnell told Plaintiff that he already had a copy of the

governing contract since "it's universal," and (2) O'Donnell told Plaintiff that, in keeping with

the Union's practice, he would receive a copy of the CBA once the Union had a copy of "the

fully executed agreement."  (*Id*. at 112:15–113:2.)  Plaintiff, on the other hand, testified that he

"had trouble getting contracts."  (Hunter Aff., Ex. A at 17:6–7.)  Plaintiff further testified that he

did not receive the 2013 Majors' Agreement, nor did he receive the CBAs governing "A Further

Gesture" or "Spiderman."  (*Id*. at 141:2–144:16.)

At the summary judgment stage, the Court's function is not to weigh the evidence, but

simply to inquire whether there remain disputed material facts such that there is the need for a

trial.  *See Anderson*, 477 U.S. at 249–50.  Here, Defendants cannot definitively establish that

Plaintiff did *not* receive copies of the requested CBAs.  Because the Court must examine the

evidence in the light most favorable to Plaintiff as the non-moving party and draw all reasonable

inferences in his favor, the Court ultimately finds that Plaintiff has sufficiently pointed to

genuine fact disputes material to the question of whether he received copies of requested CBAs

so as to render summary judgment on this issue inappropriate.

With respect to Plaintiff's receipt of the Union's constitution and bylaws, Defendants

assert that Plaintiff in fact received a copy of the amended bylaws in or around December 2013.

(Hunter Aff., Ex. B at 118:23-120:8.)  Indeed, minutes of the Union's December 21, 2013

General Membership Meeting indisputably indicate that Plaintiff was in attendance at that

meeting during which "[c]opies of the Local Union By-Laws that were recently updated were

distributed to the members." (Anspach Decl., Ex. P.) Plaintiff nevertheless contends that he should have received a copy of the preexisting constitution and bylaws prior to IBT's approval of the new constitution and bylaws. (Hunter Aff., Ex. A at 146:15-20) ("[I]f we were working under the bylaws, whatever bylaws we were working under at that time, if the new ones weren't approved, apparently we were still working under bylaws and that's the one I should have been sent."). Plaintiff admits that he did not go to the union hall to request a copy of the preexisting constitution and bylaws, explaining that he would "have to cross the George Washington Bridge, the Triboro Bridge" to do so. (*Id*. at 146:25-147:2.) In any event, Plaintiff received a copy of the preexisting constitution and bylaws on July 17, 2013 (Hunter Aff., Ex. K.)

As Defendants point out, Plaintiff's complaint clearly is based upon the allegation that he did not receive a copy of the amended constitution and bylaws. (Compl. ¶ 27.) The Court agrees with Defendants that Plaintiff's argument that he did not receive the preexisting constitution and bylaws "is a post hoc attempt to survive summary judgment." (Defs.' Reply at 9.) In light of the evidence that Plaintiff received a copy of the amended constitution and bylaws, the Court grants Defendants' summary judgment motion with respect to Plaintiff's LMRDA Section 201 claim. *See Summerville v. Local 77*, 369 F. Supp. 2d 648, 658–59 (M.D.N.C.) *aff'd*, 142 F. App'x 762 (4th Cir. 2005) (holding Plaintiff's LMRDA claim has "no legal validity" where "it is uncontested that all of the documents and information Plaintiff requested . . . were in fact produced.").

## II.   LMRDA Section 101(a)(2) Claim

Plaintiff alleges that Defendants discriminated against him in job referrals in retaliation to Plaintiff's exercise of his free speech rights in violation of the LMRDA. Section 101(a)(2) of the LMRDA provides that "[e]very member of any labor organization shall have the right to meet

and assemble freely with other members; and to express any views, argument, or opinions; and to express at meetings of the labor organization his views . . . ." 29 U.S.C. § 411(a)(2). "Section 101(a)(2) protects union members from direct interference with union membership rights in retaliation for their expression of opinions concerning union activities." *Maddalone v. Local 17, United Bhd. of Carpenters & Joiners of Am.*, 152 F.3d 178, 183 (2d Cir. 1998) (citing *Cotter v. Owens*, 753 F.2d 223, 228 (2d Cir. 1985)).  A claim under Section 101(a)(2) of the LMRDA may be premised upon discrimination in referrals to employment. *See Maddalone*, 152 F.3d at 184–85; *see also Murphy v. Int'l Union of Operating Engineers, Local 18*, 774 F.2d 114, 123 (6th Cir. 1985) (determining plaintiff's LMRDA claims to be actionable where alleged discrimination concerned the "manipulat[ion] [of] a work referral system").  To successfully state a claim for retaliation in violation of the LMRDA, a plaintiff must establish the following: "(1) his conduct constituted 'free speech' under the LMRDA; (2) that the speech was a cause for the Union taking action against him; and (3) damages." *Commer v. McEntee*, No. 00-cv-7913 RWS, 2006 WL 3262494, at *10 (S.D.N.Y. Nov. 9, 2006) (citations omitted).

Plaintiff points to the following instances of purported "free speech" that he claims prompted Defendants' retaliation vis-à-vis Plaintiff's decline in captain work: (1) a June 3, 2002 letter from Plaintiff addressed to O'Donnell and the Union executive board regarding his lack of captain work and the "unfair" system for assigning captain work (Anspach Decl., Ex. B at Ex. 11); (2) a July 28, 2005 letter from Plaintiff addressed to O'Donnell regarding Plaintiff's exclusion from a captains list (*id*. at Ex. 13); (3) a June 4, 2012 letter from Plaintiff to O'Donnell purporting to file a grievance "against all Hollywood and Independent Producers of Films, Motion Picture and Television shows and Productions" on behalf of "all Teamster Captains" (*id*. at Ex. 16); (4) a July 31, 2012 letter from Plaintiff to O'Donnell explaining a request for certain

13

categories of documents to pursue his grievance outlined in the June 4 letter (*id*. at Ex. 18); (5)

Plaintiff's circulation in 2008 of a petition regarding the swap of the Election Day holiday (*id*. at

Ex. 15); (6) Plaintiff's inquiries and complaints regarding the retirement fund and scholarship

fund (Pl.'s 56.1 ¶ 126); (7) a November 2010 verbal complaint to O'Donnell regarding working

conditions on the "Premium Rush" job (*id*. ¶¶ 97–98); (8) Plaintiff's abstention from a

membership vote on changes to the Majors' Agreement at an October 2013 union membership

meeting (*id*. ¶ 113); (9) unspecified complaints on behalf of all captains regarding assignment of

captain work (*id*. ¶ 122); (10) Plaintiff's support of Henry Boyle (*Id*. ¶ 122); (11) Plaintiff's 1995

complaint regarding Maurice Fitzgerald's receipt of work before other captains with more

experience (*id*. ¶ 102); (12) Plaintiff's support for Mickey Fennell in his attempt to become a

captain (*id*. ¶¶ 88–90); and (13) Plaintiff's support for John Brady to become a member of the

Union (Pl. 56.1 ¶ 96).  (Pl.'s Opp. at 12–13.)

Courts in this jurisdiction are clear that free speech within the meaning of the LMDRA is

speech made "in the context of the union democratic process, i.e. political speech *primarily*

*addressed to other union members*, rather than free speech at large."  *Helmer v. Briody*, 759 F.

Supp. 170, 176 (S.D.N.Y. 1991) (emphasis added); *see also Monaco v. Smith*, No. 00-cv-5845

(RMB), 2004 WL 203009, at *9 (S.D.N.Y. Feb. 2, 2004); *Kazolias v. IBEW LU 363*, No. 09-cv-

7222 (RO), 2013 WL 3682926, at *8 (S.D.N.Y. July 1, 2013).  In *Helmer*, the court granted

defendants' motion for summary judgment with respect to plaintiff's LMRDA retaliation claim.

*Id*. at 171.  The court concluded that plaintiff failed to present evidence "that he ever voiced his

belief in the corruption of the [union's] leaders to his fellow members."  759 F. Supp. at 177.

Similarly, in *Kazolias*, the court held that plaintiffs' speech was not protected by the LMRDA

because plaintiffs neither "alleged [nor] demonstrated that their complaints or the content therein

were in any way communicated to union members."  2013 WL 3682926, at *8.  Finally, in

*Monaco*, the court granted defendants' motion for summary judgment on plaintiff's LMRDA

retaliation claim because "[p]laintiff's statement directed solely to his supervisor is not the type

of speech that Title I of the LMRDA was designed to protect."  2004 WL 203009, at *9.

Under this framework, it is clear that Plaintiff's letters to O'Donnell (or O'Donnell and

the executive board) do not constitute "free speech."  Plaintiff has failed to present any evidence

that his complaints, letters, and grievances, or the substance thereof, were communicated to other

union members.  Moreover, neither case Plaintiff relies upon for the proposition that speech

regarding the job referral system is categorically free speech is binding upon this court.  *See*

*Kelsey v. IATSE*, 294 F. Supp. 1368 (E.D. Pa. 1968), *aff'd sub nom. Kelsey v. Philadelphia Local*

*No. 8 of Int'l Alliance of Theatrical Stage Emp. & Moving Picture Mach. Operators of U.S. &*

*Canada*, 419 F.2d 491 (3d Cir. 1969) *and United Bhd. of Carpenters, Local 522*, 269 N.L.R.B.

574 (N.L.R.B. 1984).[1]  Having determined that Plaintiff's June 3, 2002; July 28, 2005; June 4,

2012; and July 31, 2012 letters do not qualify as "free speech" under the LMRDA, the court need

not analyze the remaining two factors with respect to those letters.

The Court turns next to the second factor—whether the union member's speech was a

cause for the union taking action against him.  Causation is established by demonstrating a

"direct nexus between the union's action and the member's exercise of his § 411 rights."  *Mayes*

*v. Local 106, Int'l Union of Operating Engineers*, No. 86-cv-41, 1995 WL 30576, at *21

(N.D.N.Y. Jan. 20, 1995) *aff'd sub nom. Mayes v. Jones*, 99 F.3d 402 (2d Cir. 1995).

"[C]onclusory remark[s] cannot support the demonstration of a causal connection."  *Ponticelli v.*

---

[1] In any event, Plaintiff misreads *Kelsey*.  In *Kelsey*, the court held that speech is protected where it "concern[s] a matter of interest to the members of the union," which is consistent with the law in this district.  294 F. Supp. 1368 at 1375.  The court there did not create a bright line rule that speech regarding the union referral process is necessarily protected free speech.

*Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 436–37 (S.D.N.Y. 1998).  Moreover, "the absence of selective prosecution or dissimilar treatment defeats a claim of retaliation under the LMRDA." *Hussein v. Hotel Emps. & Rest. Union, Local 6*, 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) *vacated on other grounds* 14 Fed. Appx. 39 (2d Cir. 2001) (citing *Ricks v. Simons*, 759 F. Supp. 918, 924 (D.D.C. 1991)).

Defendants advance a series of arguments attacking any purported connection between Plaintiff's speech and his receipt of captain jobs: (1) the Union had no knowledge of most of Plaintiff's speech; (2) the record is devoid of evidence of animus on the Union's part; and (3) there was a substantial time gap between Plaintiff's speech and the purported decline in his receipt of captain jobs.  (Defs.' Mot. at 6–8.)  While there are certainly large gaps in time between certain of Plaintiff's proffered examples of free speech (i.e., Plaintiff's circulation of a petition in June 2008 or his 1995 complaint regarding Maurice Fitzgerald) and when he claims he began to see a decline in his captain work, which tends to support Defendants' argument that no nexus exists, Plaintiff rightfully points out that temporal proximity is merely one means of establishing a connection between speech and the Union's action.  (Pl.'s Opp. at 18) (citing *Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990)).

More fatal to Plaintiff's Section 101(a)(2) claim, however, is the fact that Plaintiff simply has failed to proffer any evidence tending to establish that his speech caused the alleged decline in Plaintiff's captain jobs.  Plaintiff argues that beginning in late 2010 through 2011, he began to engage in more protected activity; specifically, his November 2010 complaint to O'Donnell regarding "Premium Rush," his support of Henry Boyle, and his support of John Brady.  (Pl.'s Opp. at 16.)  Plaintiff points to a subsequent decline in his earnings from 2011 to 2012 as evidence of retaliation for that activity.  (*Id.* at 16–17).  However, Plaintiff's 2013 earnings were

nearly the same as his 2011 earnings.  (Pl.'s 56.1 ¶¶ 65, 69.)  Plaintiff testified that he

complained to O'Donnell about the insufficient working conditions on the set of "Premium

Rush."  (Anspach Decl., Ex. A at 99:22-100:20.)  Plaintiff later confirmed that he did not

experience those conditions on subsequent jobs (Anspach Decl., Ex. A at 101:8-13) and that

O'Donnell intervened to prevent producers on "Premium Rush" from firing Plaintiff's co-

captain.  (Anspach Decl., Ex. A at 103:18-104:3.)  With respect to the Boyle incident, Plaintiff

testified that he called Boyle after Boyle got in a "shouting match" with O'Donnell's father;

however, Plaintiff admitted that he never told any union officer that he supported Boyle.

(Anspach Decl., Ex. A at 105:8-106:4.)  Additionally, O'Donnell testified that he was not aware

that Plaintiff supported or assisted Boyle.  (Anspach Decl., Ex. B at 153:9-15.)  Finally, Plaintiff

testified that John Brady complained about missing meal money (Anspach Decl., Ex. A at 169:5-

15); however, Plaintiff has failed to adduce any evidence that he engaged in any protected "free

speech" with regard to Brady's complaint.  To conclude that these isolated incidents, even

considered together, prompted retaliation would require the Court to make an illogical leap.

Plaintiff's own testimony is equally unavailing.  In support of his claim that he was being

discriminated against, Plaintiff testified that he "*believe[d]* that the discrimination *could have

been* very likely that [producers] were pleasing [O'Donnell] in not accepting [Plaintiff]" for

captain work.  (Anspach Decl., Ex. B at 117:4–6) (emphasis added).  When pressed for proof on

this point, Plaintiff pointed to the fact that he wasn't working.  (*Id*. at 117:8–9.)  With regard to

his claim that he was blacklisted by the Union, Plaintiff testified that, "*[i]n [his] opinion* people

that are talking about my name and my job ability when they haven't met me, I believe that is to

be slandered . . . ."  (*Id*. at 179:21–24) (emphasis added).  A party's own suppositions that he is

being discriminated against, when lacking evidentiary support, are insufficient to withstand

summary judgment.

Defendants, on the other hand, have set forth evidence demonstrating that Plaintiff's decline in captain work is attributable to Plaintiff's own poor reputation. (Defs.' Mot. at 16.) In particular, Defendants point to the affidavits of producers who have worked with Plaintiff.[2] In his affidavit, M. Blair Breard declared that his experience working with Plaintiff on a feature film was "so negative" that he "strike[s] his name" "whenever his name is on the list of available Captains for a project on which I'm working . . . ." (Bread Aff. ¶ 3.) Scott Ferguson, a producer of studio and independent film and television productions, similarly stated in his affidavit that he "would not contemplate doing another job with [Plaintiff] as [his] captain" since Plaintiff "fall[s] short" with respect to essential captain skills. (Ferguson Aff. ¶¶ 3–6.) In his affidavit, Sean Fogel, an assistant unit production manager in the film industry, stated that he did not select Plaintiff as captain when presented with his name on a list of available captains. (Fogel ¶ 2.) Celia Roque, a producer and production manager in the movie industry, declared that she does not choose Plaintiff as captain when his name appears on the list of five because there are "better choices for captains." (Roque Aff. ¶ 8.) Mari Jo Winkler-Ioffreda, an executive producer in the

---

[2] Plaintiff contends that affidavits of previously unnamed producers should not be considered by this Court pursuant to Rule 37 of the Federal Rules of Civil Procedure. (Pl.'s Mot. at 5.) Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A party has a responsibility to supplement its Rule 26 disclosure only "when the omitted or after-acquired information 'has not otherwise been made known to the other parties during the discovery process.'" *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011) *aff'd in part, vacated in part sub nom. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) (quoting 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010)). Though Defendants did not disclose the exact identity of the producers, they did, as Plaintiff acknowledges, disclose "various producers" in their initial disclosures. (Pl.'s Mot. at 5.) Plaintiff was aware of the identity of the producers through previously produced documents and deposition testimony. More to the point, Plaintiff was aware that these producers, as Plaintiff's former employers, were in a position to speak to Plaintiff's performance. As such, the Court will consider the affidavits of the producers in support of Defendants' motion.

move industry who worked with Plaintiff on the set of "Premium Rush," stated in her affidavit that she had been "reluctant" to select Plaintiff as captain due to his "bad reputation among producers" but O'Donnell "urged [her] to give him a chance." (Winkler-Ioffreda Aff. ¶ 3.) She further stated that she found Plaintiff's "communication skills and his organizational skills less than satisfactory" (*id*. ¶ 5) and has subsequently declined to work with Planitiff. (*Id*. ¶ 12.)

There is absolutely no basis on the evidence before this Court to conclude that Defendants retaliated against Plaintiff vis-à-vis the referral of captain work. Rather, the record reflects that, to the extent Plaintiff experienced a decline in captain work, it was due to his own reputation. And, in any event, Plaintiff's 2013 earnings were nearly the same as his 2011 earnings, which cuts against Plaintiff's argument that he received less work due to his exercise of his free speech rights. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's LMRDA Section 101(a)(2) claim.

## III.    Duty of Fair Representation Claims

Plaintiff's second and third claims relate to alleged breaches of the duty of fair representation ("DFR"). In particular, Plaintiff alleges that Defendants acted arbitrarily and capriciously in denying him job referrals (second claim) and that Defendants denied him access to requested job referral information (third claim). (Pl.'s Opp. at 9, 21.) A union certified under the NLRA owes to its members a duty of fair representation. *Kazolias v. IBEW LU 363*, No. 09-cv-7222 RO LMS, 2012 WL 6641533, at *9–10 (S.D.N.Y. Dec. 11, 2012) *report and recommendation adopted in part*, No. 09-cv-7222 RO, 2013 WL 3682926 (S.D.N.Y. July 1, 2013) (citing *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). "A union breaches its duty of fair representation if its actions 'can fairly be characterized as so far outside a "wide range of reasonableness" . . . that [they are] wholly "arbitrary, discriminatory, or in bad faith.""" *Spellacy*

19

*v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) (quoting *Airline Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quotations omitted)).  Review of union activity for an alleged DFR breach "'must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.'"  *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir. 1991) (quoting *O'Neill*, 499 U.S. at 66).

### A.  Claim Regarding Job Referrals

Plaintiff alleges that Defendants breached their DFR by discriminating against him with respect to job referrals.  A union member may assert a DFR claim based upon a union's "wrongful refusal to refer him for work."  *Kazolias*, 2012 WL 6641533, at *9–10 (citing *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 82 (1989)).  To successfully assert a DFR claim, a plaintiff must establish: (1) the union acted in an arbitrary or discriminatory manner, or in bad faith and (2) a "causal connection between the union's wrongful conduct and their injuries."  *Spellacy*, 156 F.3d at 126.  Bad faith is evidenced by an "improper intent, purpose, or motive" and "encompasses fraud, dishonesty, and other intentionally misleading conduct."  *Id.*[3]

For the same reasons set forth in Section II, *supra*, Plaintiff has failed to proffer sufficient evidence that the Union acted in an arbitrary or discriminatory manner, or in bad faith, in its

---

[3] The statute of limitations for a DFR claim is six months.  *See Eatz v. Local Union No. 3 of I.B.E.W.*, 794 F.2d 29, 33 (2d Cir. 1986).  Plaintiff asserts that the six month time period should be tolled due to delayed discovery or the continuing violation doctrines.  (Pl.'s Opp. at 25.)  That very argument, however, was rejected by the court in *Kazolias*, and this Court agrees that neither doctrine is applicable to DFR claims.  *See Kazolias*, 2012 WL 6641533, at *12; *see also Phelan v. Local 305 of United Ass'n of Journeymen, and Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canda*, 973 F.2d 1050, 1060 (2d Cir. 1992).  A DFR claim accrues when Plaintiff reasonably could become aware that he was being retaliated against with respect to referrals.  *Kazolias*, 2012 WL 6641533, at *12.  Here, Plaintiff argues that he noticed a decline in captain work beginning in October 2011.  (Pl.'s 56.1 ¶ 48.)  Therefore, only those alleged discriminatory referrals which occurred after July 31, 2012 (six months prior to Plaintiff's filing of his suit on January 31, 2013) would be considered in evaluating whether Defendants breached their DFR.  *See Mayes v. Local 106, Int'l Union of Operating Engineers*, No. 86-cv-41, 1993 WL 435665, at *9 (N.D.N.Y. Oct. 12, 1993).

operation of the referral system.  While "[f]ailure to follow objective standards in assessing worker qualifications for specialty referrals may constitution a breach of a union's duty of fair representation," mere "conjecture" that a Union is not operating its referral system objectively "does not constitute substantial evidence."  *N.L.R.B. v. Local 46, Metallic Lathers Union & Reinforcing Iron Workers of New York & Vicinity of the Int'l Ass'n of Structural & Ornamental Iron Workers*, 149 F.3d 93, 106 (2d Cir. 1998).  Therefore, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's DFR job referral claim.

### B.  Claim Regarding Job Referral Information

Plaintiff's next DFR claim is premised upon Defendants' alleged failure to provide him with requested job referral information, in violation of Section 8 of the NLRA, 29 U.S.C. § 158(b), and Section 301 of the LMRA.  (Pl.'s Opp. at 9.)  "A union breaches its duty of fair representation in violation of section 8(b)(1)(A) of the NLRA when it arbitrarily denies a member's request for job referral information, when that request is reasonably directed towards ascertaining whether the member has been fairly treated with respect to obtaining job referrals." *NLRB v. Carpenters Local 608, United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 811 F.2d 149, 152 (2d Cir. 1987).  Courts are clear that so long as a union member's request for information is "made in *good faith*," the union must furnish its member with the requested information and may not refuse the request "based on its own determination that the grievance underlying the request is non-meritorious or that the information sought is not essential."  *Local 608*, 811 F.2d at 152–53.  Moreover, the request need not be motivated solely by a member's belief that he/she is being treated unfairly by the union.  *Id.* at 152.

Here, Plaintiff's request for information was made pursuant to a grievance letter Plaintiff sent to members of the Union's executive board dated June 4, 2012, which stated that Plaintiff

was "denied work as a Teamster Captain to less experienced workers, without cause, over the last six months" (the "June 2012 Request").  (Anspach Decl., Ex. B at Ex. 16.)  Defendants contend that Plaintiff failed to demonstrate a good faith basis for the June 2012 Request because it was not aimed at establishing whether the Union treated him fairly in captain referrals; rather, he sought, through a "fishing expedition," evidence to bolster a lawsuit against movie and television producers.  (Defs.' Mot. at 23–24.)  Defendants further argue that Plaintiff's request for information was unreasonable because the Union informed Plaintiff that he was receiving less captain work due to a poor reputation among producers, and Plaintiff's belief that he was being discriminated against was "pure conjecture."  (*Id*. at 24.)  Finally, Defendants assert that Plaintiff's request for information was overbroad and burdensome based upon the volume of documents Plaintiff sought, Plaintiff's knowledge that certain documents were not maintained by the Union, the irrelevance of certain documents to his discrimination complaint, and Plaintiff's knowledge that he was not entitled to certain information and/or it did not exist.  (*Id*.)

Plaintiff maintains that his request was motivated by a desire "to better understand the captain referral process and how he was treated" and that he was entitled to investigate for himself the cause of the decline in his captain work in lieu of relying upon the Union's explanation.  (Pl.'s Opp. at 10.)  Plaintiff testified that the June 2012 Request was premised upon O'Donnell's practice to "bypass" Plaintiff for "less experienced captains on jobs" and his observation that other captains were receiving more work than Plaintiff.  (Anspach Decl., Ex. A at 153:21–154:2.)  Upon O'Donnell's written request of June 27, 2012 that plaintiff provide more specificity to his grievance that he was "unfairly denied work as a transportation captain," (Anspach Decl., Ex. B at Ex. 17) Plaintiff responded by letter on July 31, 2015, outlining categories of certain documents he required to pursue his grievance.  (Anspach Decl., Ex. B at

Ex. 18.)  Plaintiff requested, among other things, copies of producers' requests for captains, electronic or written communications concerning Plaintiff's work, and a list of the captains and their seniority.  (Anspach Decl., Ex. B at Ex. 18.)  It is undisputed that Defendants did not respond to Plaintiff's July 31, 2015 letter or provide Plaintiff with any of the information he requested.  (Pl.'s 56.1 ¶ 109.)  Because there is evidence from which a reasonable juror could conclude that the June 2012 Request was made in good faith, the Court need not determine whether Plaintiff had additional motivations in his request for information beyond whether he was being treated unfairly by the union.  Moreover, Defendants are not permitted to deny Plaintiff's request for information based upon their determination that Plaintiff's request was unreasonable.  Accordingly, this Court denies Defendants' motion for summary judgment with respect to Plaintiff's DFR job referral information claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's claims under LMRDA Sections 201 and 101(a)(2) and DENIED with respect to Plaintiff's claim under LMRDA Section 104.  The Court additionally GRANTS summary judgment on Plaintiff's claim that Defendants breached their duty of fair representation in their operation of the job referral system and DENIES summary judgment on Plaintiff's claim that Defendants breached their duty of fair representation with respect to the provision of job referral information.

The Court respectfully directs the Clerk to terminate the motion at ECF No. 15.  The parties are directed to appear for a pretrial conference on November 23, 2015 at 10:30 AM.

Dated:    October 5, 2015                                        SO ORDERED:
          White Plains, New York

                                          _____
                                          NELSON S. ROMÁN
                                          United States District Judge